IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| MARY HARRIS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. |
| | § | 3:05-CV-2358-B |
| JO ANNE B. BARNHART, | § | (ECF) |
| COMMISSIONER of the SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | |

FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

The District Court referred this case to the United States Magistrate Judge for findings, conclusions, and recommendation pursuant to 28 U.S.C. § 636(b). Mary Harris ("Plaintiff") appeals from the decision of Jo Anne B. Barnhart, Commissioner of the Social Security Administration ("Commissioner"). The Commissioner denied Plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act ("Act"). Plaintiff resides in Dallas, Texas, which is located within the jurisdiction and venue of the United States District Court for the Northern District of Texas, Dallas Division.

I.    **Background**[1]

Plaintiff previously filed applications for DIB and SSI on July 23, 2001, alleging a disability onset date of March 19, 2001, due to heart problems. (Tr. 58.) The applications were denied on November 9, 2001, and Plaintiff did not appeal. (Tr. 29-35.) Plaintiff filed new applications for DIB and SSI on October 3, 2002, with a protective filing date of September 17, 2002. (Tr. 61-63, 382-84.) She claimed that she had been disabled since March 19, 2001, due to heart problems. (Tr.

---

[1] References to the administrative record are designated as "Tr."

15, 91.)  An Administrative Law Judge ("ALJ"), Arthur J. Shultz, held an administrative hearing on

August 2, 2004.  (Tr. 446-66.)  The ALJ issued a decision on August 20, 2004, denying Plaintiff's

applications.  (Tr. 14-20.)  The ALJ found that despite Plaintiff's severe impairment, heart disease,

she retained the ability to perform the vocational demands of light work activity, including her past

relevant work as a hotel cleaner and housekeeper supervisor.  (Tr. 19-20.)  Plaintiff appealed, but

the Appeals Council declined review on September 30, 2005.  (Tr. 4-6.)  Accordingly, the ALJ's

decision became the Commissioner's final decision ("Decision") for purposes of this Court's review

pursuant to 42 U.S.C. § 405(g).

## II.    Issues

Plaintiff alleges that substantial evidence does not support the ALJ's decision that Plaintiff

retained the residual functional capacity ("RFC") for light work.[2]  (Pl.'s Br. at 7.)  Plaintiff also

alleges that the ALJ failed to include Plaintiff's rate of absenteeism in the RFC.  (*Id*. at 10.)  Finally,

Plaintiff alleges that the ALJ failed to evaluate whether Plaintiff was eligible for a closed period of

disability. (*Id*. at 13.)  The Commissioner responds that the ALJ applied the correct legal standards

and that substantial evidence supports the Commissioner's decision that Plaintiff was not disabled

at any time through August 20, 2004, the date of the Decision.  (Def.'s  Br. at 6-19.)

---

[2]     "Light work involves lifting no more than 20 pounds at a time with frequent
lifting or carrying of objects weighing up to 10 pounds.  Even though the weight
lifted may be very little, a job is in this category when it requires a good deal of
walking or standing, or when it involves sitting most of the time with some
pushing and pulling of arm or leg controls.  To be considered capable of
performing a full or wide range of light work, you must have the ability to do
substantially all of these activities.  If someone can do light work, we determine
that he or she can also do sedentary work, unless there are additional limiting
factors such as loss of fine dexterity or inability to sit for long periods of time."
20 C.F.R. §§ 404.1567(b), 416.967(b).

### III.   Age, Education, and Work Experience

Plaintiff was born on April 28, 1943.  (Tr. 61.)  In Social Security terms, she was an individual of advanced age on her alleged onset date, and closely approaching retirement age on April 28, 2003.  *See* 20 C.F.R. § 404.1563(e).  Plaintiff has a high school education.  (Tr. 87.)  Her past relevant work experience involved jobs as a hotel cleaner and housekeeper supervisor.  (Tr. 82, 463.)  She has not engaged in substantial gainful employment since March 19, 2001.

### IV.   Plaintiff's Medical History

Plaintiff underwent mitral valve replacement in 1987 and a re-do mitral valve replacement on January 3, 2002.  (Tr. 131-33.)  Plaintiff was discharged from the hospital on January 9, 2002, with the principal diagnosis of mitral valve disorder and the secondary diagnoses of congestive heart failure, atrial fibrillation, and essential hypertension.  (Tr. 134.)

Before Plaintiff's January 3, 2002 mitral valve replacement, she was treated at Parkland Hospital.  She went to the emergency room on March 22, 2001, complaining that her neck was throbbing and that she had suffered several days of peripheral edema, which an examination revealed as 2+ edema.  (Tr. 327.)  The diagnoses were hypertension ("HTN"), mitral valve regurgitation ("MVR") and lung mass.  (*Id.*)  An echocardiogram showed four-chamber enlargement, regional wall motion abnormalities, moderately depressed left ventricular systolic function, pulmonary hypertension, severe tricuspid regurgitation, a bioprosthetic valve in the mitral position, and a very eccentric jet of mitral regurgitation.  (Tr. 324.)

When Plaintiff returned to Parkland on April 10, 2001, after having been off work since March 19, 2001, the diagnosis was some fluid on her legs,  HTN, increased LFT's and dyspnea.  (Tr. 311.)  The record showed that she was scheduled to return to work on April 16, 2001, and that she

felt better on medication.  (*Id.*)  At a return visit to Parkland on April 30, 2001, Plaintiff reported that she felt tired all the time.  (Tr. 309.)  She had 1+ pitting edema and congestive heart failure ("CHF").  (*Id.*)  The doctor increased her Lasix.  (*Id.*)

On May 17, 2001 Plaintiff had a CT scan of her chest which showed bi-apical scarring, bi-apical fat and soft tissue density in the right apex.  (Tr. 316.)  An opacity related to the minor fissure on the previous chest x-ray had largely resolved, but some soft tissue densities remained.  (*Id.*)  Plaintiff had several indeterminate nodules in both lungs, anterior mediastinal calcifications thought to be an old hematoma, a mitral valve prosthesis, and cardiomegaly.  (*Id.*)

On August 17, 2001, Plaintiff returned to Parkland.  She had trace edema in the extremities and was diagnosed with possible failing MVR and questionable right apical malignancy.  (Tr. 306-08.)  On September 28, 2001, the diagnosis was revised to failing MVR and apical malignancy unlikely.  (Tr. 302.)  Plaintiff was told to report to the CHF clinic for an evaluation of a possible repeat mitral valve replacement.  (*Id.*)

Plaintiff went to the CHF clinic on November 12, 2001, reporting that she felt tired.  (Tr. 290.)  She had 1-2+ lower extremity edema and was diagnosed with CHF with sever tricuspid regurgitation and failing mitral valve, Class III-IV.  (Tr. 291.)  The CHF clinic referred her to the Anticoagulation Management clinic for Warfarin or anticoagulant treatment.  (Tr. 278.)  Plaintiff went to the Anticoagulation Management clinic several times through the hearing date. (Tr. 209, 215, 216, 219, 166, 269, 277, 278, and 293.).

On December 11, 2001, Plaintiff went to Parkland, reporting that she felt tired.  (Tr. 275.)  She had trace edema, CHF, and failing porcine mitral valve.  (Tr. 276).  Plaintiff's cardiologist, Dr. Mark Strong, completed a form for a private insurance company, assessing her impairments and

functional abilities.  (Tr. 379-80.)  Dr. Strong assessed Plaintiff's tolerance for sitting at 3-4 hours, her tolerance for standing at 1-2 hours, and her tolerance for walking at 1 hour.  (*Id.*)  He stated she could occasionally lift and carry less than 10 pounds and gave her a New York Heart Association classification of IV.[3]  (Tr. 380.)  He noted that she was scheduled for a re-do mitral valve procedure and concluded that her chances of ever returning to work were unlikely.  (*Id.*)

On January 3, 2002, Plaintiff underwent a re-do mitral valve surgery.  (Tr. 131.)  She was discharged on January 9, 2002, with the principal diagnosis of mitral valve disorder and the secondary diagnoses of CHF, atrial fibrillation, and essential hypertension, unspecified benign or malignant.  (Tr. 134.)  Plaintiff began cardiac rehabilitation on February 5, 2002.  (Tr. 250.)  On that date, she reported that she walked for exercise, was able to do all activities of daily living, and had no pain, no difficulty breathing, no swelling in her feet, legs, or abdomen, and that she had not been dizzy.  (*Id.*)  Dr. Strong examined her  on March 6, 2002, and April 25, 2002, and diagnosed her as CHF Class II, stable.  (Tr. 243-44, 224-25.)

---

[3]  The severity of heart failure can be classified symptomatically by the use of a scheme such as the New York Heart Association functional classification, which groups patients according to the amount of effort needed to produce heart failure symptoms:

| Class I. | Patients exhibit symptoms only at exertion levels similar to those of relatively healthy individuals. |
|---|---|
| Class II. | Patients exhibit symptoms with ordinary exertion. |
| Class III. | Patients exhibit symptoms with minimal exertion. |
| Class IV. | Patients exhibit symptoms at rest. |

Symptoms that suggest heart failure include: difficulty breathing; fatigue; decreased exercise tolerance; delirium; decreased food intake; and decreased functional status.  *See* Guideline for Heart Failure,  http://www.guideline.gov/summary/summary.aspx?doc_id=3303&nbr=2529.

On May 31, 2002, Plaintiff reported feeling "good" and stated that she cared for her two and one-half year old grandson without fatigue. (Tr. 230-31.)  She also walked one to two blocks without fatigue and remained CHF Class II, stable. (*Id.*)  Plaintiff was still "doing well" in November 2002, despite a diagnosis of rheumatic heart disease. (Tr. 203.)  Parkland Health & Hospital System records from November 2002 through August 2003 demonstrate asymptomatic findings. (Tr. 171-293.)  She showed no shortness of breath, extremity edema or pain, chest pain, exercise intolerance or any change whatsoever in her overall health. (*Id.*)  Her condition remained largely the same from November 2003 through July 2004. (Tr. 330-76.)  Plaintiff continued at the Anticoagulation Management clinic throughout 2003 and 2004. (Tr. 171, 173, 175, 178, 330, 341, 344, & 347.)

## V.    The Administrative Hearing

### A.    Plaintiff's Testimony

Plaintiff testified that she was 61 years old at the time of the hearing. (Tr. 450.)  She went through twelfth grade and is able to read and write, add and subtract. (*Id.*)  Plaintiff's last job was a supervisor of housekeeping on the P.M. shift at the Fairmont Hotel. (Tr. 450-51.)  Her previous job was cleaning hotel rooms. (*Id.*)  Plaintiff testified that after her last surgery she had experienced dizziness, fatigue, and consistently feels tired. (Tr. 453.)  She claimed that she had to have her blood checked frequently because of her prescription blood thinner. (*Id.*)  According to Plaintiff's testimony, she spent most of her day trying to clean the house. (Tr. 454.)  Once in a while she experienced dizziness, and if she failed to take her medication, she experienced swelling. (Tr. 455.)  She testified she lived with her daughter and claimed her daughter does most of the cleaning and cooking. (*Id.*)  She claimed she sometimes experienced unbearable pain in her spine. (Tr. 457.)  She testified that she last worked in April 2001. (*Id.*)  She testified that she received private disability

insurance from the time she last worked until August 2002.  (Tr. 459.)

**B**.       **Testimony of the Vocational Expert ("VE") at the Hearing**

The VE, Rebecca Thomason-Hayes, testified that Plaintiff's past relevant work as a hotel cleaner, is light, unskilled, and her past relevant work as a housekeeper supervisor is light and skilled. (Tr. 464.)  The ALJ asked the VE hypothetical questions, and the VE verified that her testimony was consistent with the Dictionary of Occupational Titles ("DOT").  (*Id*.)   Plaintiff's counsel did not cross-examine her about the classifications and testimony.   Rather, he asked if a person could maintain employment if the person missed work as much as one day a month.  (*Id*.)  The VE testified that the person could maintain employment.  (Tr. 465.)  The VE further testified that missing more than one day a month would probably preclude maintaining employment.  (*Id*.)  However, the VE also testified that some employers give employees one day a month for sick leave.  (*Id*.)

**VI**.    **The ALJ's Decision**[4]

The ALJ discussed Plaintiff's medical records from March 2001 through November 2003. In summary, he found that Plaintiff underwent mitral valve replacement in 1987 but went back to work at light work activities.  He noted she had mitral valve regurgitation and underwent a re-do replacement of her mitral valve in January 2002.  He remarked that examinations and tests following the surgery did not show that she had symptoms of heart problems.  Her heart size decreased and her ventricular functioning had improved.

The ALJ discussed in detail Dr. Strong's December 2001 opinion that Plaintiff was unable to work.  The ALJ noted that Dr. Strong's opinion did not indicate that Plaintiff was prevented from doing work activities for twelve months and that the record did not substantiate that Plaintiff

---

[4] Tr. 14-20.

continued having a severe limiting heart impairment.  The ALJ found that Dr. Strong's opinion that Plaintiff would never be able to work again was not supported by the record and was, in fact, inconsistent with the medical records.  The ALJ found that Dr. Strong's opinion was not entitled to controlling weight, or even any evidentiary weight.

The ALJ found that the medical tests and medical evidence failed to support that Plaintiff had a back or heart impairment that produced the symptomatology to which she testified at the hearing. The ALJ found that Plaintiff had been diagnosed with CHF which had been stable, and that tests showed that her heart size was normal.  She required a second surgery on her mitral valve, but the follow-up examinations showed that her condition had improved.

The ALJ concluded that Plaintiff had not received the type of medical treatment that one would expect for a totally disabled person.  He noted that, except for the mitral valve surgery, Plaintiff's treatment was essentially routine and conservative in nature.  The ALJ gave some weight, although not as much as that given to the treating physicians, to the state agency medical consultants ("SAMC"), non-examining physicians employed by the State Disability Determination Services. Their conclusions supported a finding of "not disabled."

The ALJ found that Plaintiff's testimony about her symptoms and activities was not credible to the extent alleged and that Plaintiff retained the residual functional capacity for light work.  The ALJ further found the VE's testimony to be reliable, and relied upon the VE's testimony to find that Plaintiff could perform her past relevant work as a housekeeper supervisor and hotel cleaner. Alternatively, the ALJ found that Plaintiff had transferrable skills, such as record keeping and customer service and could perform sedentary work such as timekeeper, appointment clerk, and

information aide.[5]  The ALJ found at step four that Plaintiff was not disabled, but that, even if she could perform only sedentary work, work that Plaintiff could perform existed in significant numbers in the national and local economies.  Therefore, at step five, the ALJ found alternatively that Plaintiff was not disabled.

## VII.   Legal Standards

A claimant must prove that she is disabled for purposes of the Social Security Act to be entitled to social security benefits.  *Leggett v. Chater*, 67 F.3d 558, 563-64 (5th Cir. 1995); *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled.  Those steps are:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work she has done in the past, a finding

---

[5]    The VE testified that there are 65,000 timekeeper jobs in the United States and 4,400 in Texas.  She further testified that there are 200,000 appointment clerk jobs in the United States and 15,000 in Texas.  Finally, she testified that there are 55,000 information aide jobs in the United States and 4,000 in Texas.  (Tr. 463.)

of "not disabled" must be made.

5.      If an individual's impairment precludes her from performing her past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)). Under the first four steps of the inquiry, the burden lies with the claimant to prove her disability. *Leggett*, 67 F.3d at 564. The inquiry terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). The Commissioner's determination is afforded great deference. *Leggett*, 67 F.3d at 564. Judicial review of the Commissioner's findings is limited to whether the decision to deny benefits is supported by substantial evidence and to whether the proper legal standard was utilized. *Greenspan*, 38 F.3d at 236; 42 U.S.C.A. § 405(g). Substantial evidence is defined as "that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance." *Leggett*, 67 F.3d at 564. The reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.

VIII. **Analysis**

Plaintiff alleges generally that the ALJ's decision is not supported by substantial evidence and that the ALJ failed to consider whether Plaintiff met the eligibility requirements for a closed period of disability. (Pl.'s Br. at 7-15.) The Commissioner argues that the relevant adjudicated time period here does not extend back to Plaintiff's alleged onset date of March 19, 2001, but only until November 9, 2001, the date of the decision that Plaintiff failed to appeal. (Tr. 29-35.) Thus, the Commissioner argues that Plaintiff is bound by the prior decision finding her not disabled from March 19, 2001 through November 9, 2001. Plaintiff has not refuted this argument and the Court finds it to be correct. The terms of 20 C.F.R. §§ 404.900(b), 416.1400(b) govern the process for administrative review:

> If you are dissatisfied with [the Commissioner's] decision in the review process, but do not take the next step within the stated time period, you will lose your right to further administrative review and your right to judicial review, unless you can show [the Commissioner] that there was good cause for your failure to make a timely request for review.

Further, the terms of 20 C.F.R. §§ 404.987, 416.1487 provide that failure to request review waives right to further review and the decision becomes final.

Plaintiff did not request review of the ALJ's decision on her previous application. Therefore, the relevant time period for this case is November 10, 2001, through August 20, 2004, the date of the ALJ's decision (Tr. 20). The twelve months necessary for a closed period did not elapse between the date of the previous decision and the re-do of the mitral valve surgery. Although the ALJ evaluated medical evidence well before this time period in his decision, he was not required to do so. Thus, Plaintiff did not suffer substantial prejudice even if the ALJ did not consider whether Plaintiff was entitled to a closed period of disability. (Tr. 16.) *See* 20 C.F.R. §§ 404.957(c)(1), 416.1457(c)(1).

Plaintiff's argument that the ALJ failed to consider a closed period of disability fails.  Moreover,

Plaintiff has not shown that the ALJ failed to consider a closed period of disability.  The ALJ stated

that "[Dr. Strong's] opinion does not indicate that the claimant was prevented from doing these work

activities for 12 months, and the record does not substantiate that she continued having a severe

limiting heart impairment." (Tr. 17.)  Apparently, the ALJ considered whether Plaintiff was entitled

to a closed period of disability and decided that her heart condition did not prevent her from doing

work activities for 12 months.

### A.    Whether Substantial Evidence Supports the ALJ's Decision

Plaintiff contends that substantial evidence does not support the ALJ's finding of a RFC for

a full range of light work.  She faults the ALJ's finding that "[s]everal of the clinical notes do not

indicate [Plaintiff] had symptoms such as shortness of breath, edema or chest pain" (Tr. 16).  (Pl.'s

Br. at 7.)   Plaintiff argues that this finding was "inaccurate" and cites various medical reports that

show that  she did experience some shortness of breath, edema and/or chest pain.  (Pl.'s Br. at 7-8.)

The ALJ did not state that all of the reports show that Plaintiff was asymptomatic.  Rather,

he stated that "several" reports – from January to March 2003 – showed that Plaintiff did not exhibit

such symptoms. (Tr. 16, 194, 196, 198.) These examinations indicated no shortness of breath,

extremity edema, chest pain, extremity pain, or exercise intolerance.  (*Id*.)  Further, the statement

about the reports from January to March was not an isolated statement.  In context, the ALJ stated:

> An x-ray in March 2002 showed [Plaintiff] had normal heart size. Exhibit 5F/69.  She
> told the doctor she could walk 1-1½ miles in March 2002.  The doctor said she was
> not in any distress and she completed phase II on an EKG. Exhibit 5F/65.  Following
> examinations continued to be negative for symptoms.  Exhibit 5F/59, 55.  An
> echocardiogram in July 2002 did not show any significant abnormalities.  Exhibit
> 5F/51.  The doctor said the claimant had rheumatic heart disease in November 2002
> but was doing well. Exhibit 5F/33.  Several of the clinical notes do not indicate the
> claimant had symptoms such as shortness of breath, edema or chest pain.  Exhibits

5F/24, 26, 28.  She was doing well with no symptoms and was continued on her present medication in May 2003.  Exhibit 5F/36. [Plaintiff] did not have any complaints in July 2003 and had decreased her blood pressure medicine on her own.  Exhibit 5F/9.  This continued to be the situation in November 2003 and on following examinations.  Exhibit 6F.

(Tr. 17.)  "An ALJ's decision is not subject to reversal, even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ."  *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  *See also Moad v. Massanari*, 260 F.3d 887, 890 (8th Cir. 2001) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.").  "[C]onflicts in the evidence are for the Commissioner and not the courts to resolve."  *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002) (quoting *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000)).  Plaintiff's first argument fails.

Plaintiff also argues that the fact that Plaintiff was taking Lasix makes the ALJ's RFC inaccurate.  The ALJ noted that Plaintiff was doing well and was continued on her present medication, thus indicating that the ALJ took into account all of Plaintiff's medications.  (Tr. 17.)  Considering the record as a whole, substantial evidence supports the ALJ's RFC determination. The Court finds that the ALJ accurately assessed the various reports of Plaintiff's symptoms and that the ALJ's statements are not inaccurate, as Plaintiff contends.

Plaintiff makes the additional argument that the fact that her doctors at Parkland stated that she was at the New York Heart Association CHF classification of II several times during her treatment indicates that the ALJ's determination of her RFC was faulty.  Plaintiff claims that by "definition" the Class II category is "inconsistent with a [RFC] of light work."  (Pl.'s Br. at 8.) Whereas, in fact, none of the Class I-IV definitions specify whether the condition is disabling under the Social Security Regulations.  The fact that Plaintiff is able to extract from the record some

13

evidence that would support a finding of disability does not mean that Plaintiff met her burden to prove at step four that she was unable to return to her past relevant work. *See Singletary v. Bowen*, 798 F.2d 818, 822-23 (5th Cir. 1986) (noting that the substantial evidence test requires consideration of the record as a whole). *See* 20 C.F.R. §§ 404.1505(a), 416.905(a) (to be disabled, a claimant must be unable to perform the claimant's past relevant work or any substantial gainful work in the national economy).

Again, the ALJ, considering the record as a whole, noted that Plaintiff was also assessed a Class I designation for exhibiting symptoms of CHF and was determined to be "stable." (Tr. 237.) The ALJ also noted a January 2002 examination which revealed Plaintiff had "clear lungs with no evidence of congestive heart failure." (Tr. 16, 263.) Further, she was "doing well" and "sleeping well" according to a March 2002 report and was still "doing well" in November 2002 despite a diagnosis of rheumatic heart disease. (Tr. 16, 203, 245.) Her condition did not change and she continued "doing well" with "no symptoms" in May 2003. (Tr. 17, 206.) Plaintiff expressed no complaints and even decreased her blood pressure medication on her own in July 2003. (Tr. 17, 179.) Her condition remained largely the same from November 2003 through July 2004. (Tr. 16, 330-76.)

Additionally, the ALJ gave some weight to the opinion of the SAMC that Plaintiff retained exertional limitations that fit within the light work category.[6] The SAMC assessed for example, that Plaintiff could still lift up to ten pounds frequently, 20 pounds occasionally; sit, stand and walk for

---

[6] "State agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6p. The consultants "consider the medical evidence in disability cases and make findings of fact on the medical issues, including, but not limited to, the existence and severity of an individual's impairment(s), [and] the existence and severity of an individual's symptoms . . . ." *Id.*

six hours a day; and she had no push/pull limitations or any other functional limitations.  (Tr. 164, 165-67.)  Plaintiff's argument that she is disabled because of her New York Heart Association classifications fails in light of the record as a whole.

Plaintiff claims that the ALJ erred by "finding that [she] could perform light work after her 2002 surgery simply because she returned to light work after her first surgery in 1987."  (Pl.'s Br. at 9.)  The Commissioner objects to this argument as a mischaracterization of the ALJ's decision. (Comm'r Resp. at 7.)  This Court agrees with the Commissioner that the ALJ did not base his decision on a simple comparison of "how someone responded to surgeries 14 to 15 years apart," as Plaintiff alleges.  (Pl.'s Br. at 8; Comm'r Resp. at 7.)  Plaintiff's claim does not accurately reflect the ALJ's well reasoned decision.  The ALJ found that Plaintiff could return to light work based on the overall medical record, including the "examinations and tests" provided by her physicians.  (Tr. 17.) Plaintiff's claim that the ALJ made an *ipso facto* conclusion fails.  Substantial evidence supports the ALJ's decision, and all of Plaintiff's arguments that the decision is not supported by substantial evidence are without merit.

**B.      Whether the ALJ Erred Regarding Plaintiff's Transferable Skills**

Plaintiff contends that the ALJ did not properly analyze Plaintiff's transferable skills in finding that she could perform sedentary work.[7]  (Pl.'s B. at 9-10.)  The ALJ found that Plaintiff retained the RFC to perform light work, including her past relevant work as a hotel cleaner and housekeeper supervisor, which relates to the fourth step of the sequential evaluation. (Tr. 18-19) *See*

---

[7] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. §§ 404.1567(a), 416.967(a).

20 C.F.R. §§ 404.1520(f), 416.920(f).  The ALJ also found alternatively that Plaintiff retained the "transferable skills, such as record keeping and customer service," that would allow her to transition to performance of a significant number of jobs in the sedentary work category.  (Tr. 19.)  Plaintiff argues that her abilities could not transfer to other occupations.  (Pl.'s Br. at 9-10.)  However, as the Commissioner correctly points out, the ALJ in this case was not required to even evaluate Plaintiff's transferable skills at step five because she retained the ability to perform her past relevant work at step four.  (Tr. 19.)  Any error in the ALJ's alternative finding at step five is not prejudicial and thus is not grounds for reversal and remand.

Nevertheless, considering Plaintiff's argument, the ALJ did not err in determining that Plaintiff retained transferable skills.  The proper legal standard for determining the transferability of skills for claimants who are closely approaching retirement age is articulated in 20 C.F.R. § 404.1568(d)(4):

> If you are closely approaching retirement age (age 60-64) and you have a severe impairment(s) that limits you to no more than light work, we will find that you have skills that are transferable to skilled or semiskilled light work only if the light work is so similar to your previous work that you would need to make very little, if any, vocational adjustment in terms of tools, work processes, work settings, or the industry.

20 C.F.R. § 404.1568(d)(4); 20 C.F.R. Pt. 404, Subpt. P, App. 2, Rule 202.00(f).  The ALJ properly considered the VE's testimony in analyzing Plaintiff's transferrable skills.  (Tr. 446-66.)  Under the Regulations, the Commissioner is not required to do so;  however, he may use a VE when "the issue in determining whether [the claimant is] disabled is whether [the claimant's] work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue." 20 C.F.R. §§ 404.1566(e), 416.966(e).  Plaintiff argues that she would require more than "very little, if any, vocational adjustment" from her previous work to the jobs described by the VE such as

16

timekeeper, appointment clerk, and referral and information aide.  (Pl.'s Br. at 9.)  Plaintiff also contends that "record keeping" and "customer service" are not "skills" that would be transferable, according to the definition of skills in SSR 82-41 ("practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner").  (Pl.'s Br. at 10.)  The Commissioner argues that Plaintiff presents an improperly narrow reading of the definition of the word "skill," as defined by the Regulations. The Commissioner also contends that Plaintiff misinterprets SSR 82-41, which indicates that the general nature of Plaintiff's vocational skills are easily transferable: "[W]here job skills have universal applicability across industry lines, e.g., clerical, professional, administrative, or managerial types of jobs, transferability of skills to industries differing from past work experience can usually be accomplished with very little, if any, vocational adjustment where jobs with similar skills can be identified as being within an individual's RFC."  SSR 82-41.

The Court finds that  Plaintiff's past work as a housekeeper supervisor of six to eight other employees provided her with job skills that "have universal applicability across industry lines." (Tr. 451.)  Thus, Plaintiff's argument that the industry, work setting, and work processes are all "different" and may possibly require the use of different tools is not persuasive. (Pl.'s Br. at 10.)  The VE properly determined that Plaintiff's past work as a housekeeper supervisor was light and skilled. (Tr. 463.)  Plaintiff does not contest this determination.  Thus, the Regulations direct that Plaintiff would be able to perform the semi-skilled jobs of timekeeper, appointment clerk, and referral and information aide.  Given the general nature and universal applicability of her past work, as well as the fact that the VE provided jobs of a lower skill level that Plaintiff could still perform, the ALJ did not commit any error in his alternative finding that Plaintiff could perform other work.

C.      **Whether the ALJ Properly Evaluated Plaintiff's Potential Absenteeism**

Plaintiff argues that the ALJ erred by not including evidence of her absenteeism in the RFC analysis as well as the hypothetical questions presented to the VE. (Pl.'s Br. at 10-13.) The Fifth Circuit requires that hypothetical questions to a VE must set out all of the claimant's limitations supported by the evidence and recognized by the ALJ. *Masterson v. Barnhart*, 309 F.3d at 273; *Bowling v. Shalala*, 36 F.3d at 436; *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988). The claimant and/or the representative must also be given the opportunity to correct perceived deficiencies in the ALJ's hypothetical question. *Id.* However, the ALJ is not bound by VE testimony if it is based upon evidentiary assumptions ultimately rejected by the ALJ. *Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985).

The medical records do not support Plaintiff's assertion that she would be required to miss work "at least twice a month" for anticoagulation management appointments.[8] (Pl.'s Br. at 11.) Plaintiff's anticoagulation management appointments varied. Sometimes she attended them three times a month (Tr. 226, 234-35, 370-73, 367-69). At other times they were scheduled once a month. (Tr. 194, 200, 208, 229, 232, 351, 357, 366, 374.) There were times when she did not have any appointment for over a month (Tr. 194, 196). The record contains no evidence that Plaintiff would have to miss work any certain number of days a month to attend the appointments. The VE testified that a person could maintain employment if she missed as much as one day a month, but that missing more than one day could be problematical. (Tr. 465.) The VE also testified that some employers give sick leave, usually one day a month. (*Id.*) The ALJ considered the VE's testimony and

_____

[8] Over a thirty-three month period, Plaintiff attended an average of 1.6 times per month. There is no evidence that the appointments would preclude employment. On Plaintiff's previous job as a hotel maid supervisor, she stated that she worked on the "P.M." shift. (Tr. 450.)

evaluated it in connection with the entire record.  The ALJ followed the proper procedures and the Decision is supported by substantial evidence.

> **D.**    **Whether the ALJ Erred Regarding a Closed Period of Disability and Applied the Wrong Legal Standard to Dr. Strong's Disability Assessment**

Plaintiff contends that the ALJ erred by not evaluating whether she qualified for a closed period of disability. (Pl.'s Br. at 13-14.)  Plaintiff cites several medical reports which show that her heart condition became worse at various times after her alleged onset date of disability (Tr. 131, 237, 243, 249, 290-91, 306, 324, 379-80).  Further, Plaintiff alleges that the ALJ improperly gave no evidentiary weight to Dr. Strong's  December 2001 opinion that Plaintiff was unable to work. (Pl.'s Br. at 13-15.)  In discussing Dr. Strong's opinion, the ALJ stated that Dr. Strong's opinion did not indicate that Plaintiff was prevented from doing work activities for a period of twelve months, and that the record does not substantiate that she continued having a severe limiting heart impairment after the re-do mitral valve surgery.  (Tr. 17.)

The Court finds that the ALJ did not err by failing to give controlling weight or other weight to Dr. Strong's disability assessment that he provided in connection with private disability insurance. (Tr. 17.)  Plaintiff fails to take into account that she was not prejudiced because she failed to appeal from the earlier denial which would make her ineligible to receive disability benefits before November 10, 2001.  (Tr. 14, 29-35, 58-60.)  Even considering Plaintiff's condition from the earlier date of March 2001, substantial evidence supports the ALJ's finding that Plaintiff was not disabled for twelve consecutive months.  Although Plaintiff was diagnosed in November 2001 at a Class III-IV CHF level, this condition was alleviated by her heart surgery in January 2002. (Tr. 131-34.)  Again, as previously discussed, several of Plaintiff's clinical notes from the Parkland Health & Hospital System from November 2001 through August 2003 demonstrate asymptomatic findings.  (Tr. 171-

293.)  She denied shortness of breath, extremity edema or pain, chest pain, exercise intolerance, or any decline in her overall health.  (*Id.*)

Shortly after her surgery, a January 2002 examination revealed Plaintiff had "clear lungs with no evidence of congestive heart failure."  (Tr. 263.)  Plaintiff indicated in February 2002 that she had no difficulty breathing; no swelling in her abdomen or lower extremities; that she walked for exercise; and that she was able to perform all her activities of daily living.  (Tr. 250.)  In March 2002, Plaintiff reported that she could walk up to one and a half miles before experiencing shortness of breath.  (Tr. 236.)  She was also assessed a Class I designation that same day, and was determined to be "stable." (Tr. 237.)  She was "doing well" and "sleeping well" according to another March 2002 report and was still "doing well" in November 2002 despite a diagnosis of rheumatic heart disease.  (Tr. 203, 245.) Her condition did not change and she continued "doing well" with "no symptoms" in May 2003.  (Tr. 206.)  Consistency is a major indication of credibility, especially an individual's statements to the administration.  SSR 96-7p.  Plaintiff's inconsistent statements, her testimony at the hearing, and the type of medical treatment she received[9] undermine her claim for disability.  (Tr. 18.)

The ALJ stated as follows with respect to Dr. Strong's opinion:

Mark Strong, M.D., said in December 2001 that [Plaintiff] was unable to work.  He opined that [Plaintiff] could lift less than 10 pounds, could not do postural activities, could sit 4 hours in an 8 hour workday, stand 2 hours in an 8 hour workday, and walk less than one hour in an 8 hour workday.  Exhibit 7F.  Tests in November 2001 showed [Plaintiff] had heart problems and the doctors had decided that she needed a second heart surgery.  This surgery was done in January 2002, and subsequent examinations and tests showed she improved immediately, and has continued to improve. [Dr. Strong's] opinion does not indicate that [Plaintiff] was prevented from doing these work activities for 12 months, and the record does not substantiate that she continued having a severe limiting heart impairment.   The records are

_____

[9] She received routine and conservative treatment with the exception of the mitral valve surgery.  (Tr. 18.)

inconclusive and inadequate to support [Dr. Strong's] opinion, which is inconsistent with the medical record, so the opinion is not entitled to controlling weight, or even any evidentiary weight. 20 C.F.R. § 404.1527 (2004) and 20 C.F.R. § 416.927 (2004) and Social Security Rulings 96-2p, 96-5p, and 96-6p.

(Tr. 17.)

An ALJ will grant the medical opinion of a treating physician "controlling weight" if it is "well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); S.S.R. 96-2p. In this case, the ALJ expressly declined to give "controlling weight" to Dr. Strong's medical opinion because it was inconsistent with other substantial evidence of record. (Tr. 17.) The ALJ cited the proper legal standard and detailed several examples of inconsistencies before reaching his decision not to grant Dr. Strong's opinion "controlling weight." (Tr. 14-15.) When the evidence in the record is inconsistent with other evidence, or is internally inconsistent, the ALJ will weigh all of the evidence and see whether he or she can decide if a claimant is disabled based on the evidence available. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. *Martinez v. Chater*, 64 F.3d at 176; *Spellman v. Shalala*, 1 F.3d 357, 364 (5th Cir. 1993); *Moore v. Sullivan*, 919 F.2d 901, 905 (5th Cir. 1990); *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (consultant's opinion chosen over treating doctor); *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981) (non-examining doctor's opinion upheld over treating doctor).

Additionally, as the Commissioner notes, the typical treating physician is not an expert in the field of Social Security jurisprudence. Thus, when a physician utilizes the term "disabled," or other similar terms, such usage probably carries with it a different connotation from that in the Act. For example, a physician may use the term "disabled" as it is used in state workers' compensation

formats. *See Coria v. Heckler*, 750 F.2d 245, 247 (3d Cir. 1984).  Physicians generally define "disability" in a manner distinct from the Act; therefore, an ALJ may reject the physician's determination of disability as determinative on the ultimate issue. *Tamez v. Sullivan*, 888 F.2d 334, 336, n.1 (5th Cir. 1989); *Milam v. Bowen*, 782 F.2d 1284, 1287-88 (5th Cir. 1986).

In this case, Dr. Strong's report was prepared in connection with private disability insurance. (Tr. 379-80.)  Moreover, the question of disability is a matter reserved for the Commissioner to determine.  *See* SSR 96-5p.  Plaintiff simply disagrees with the ALJ's assessment regarding a 12 month period of disability and Dr. Strong's opinion.  However, this does not mean that the ALJ conducted an improper analysis.  The ALJ applied the proper legal standards and substantial evidence supports the Commissioner's decision.

## IX.    __Recommendation__

This Court recommends that the District Court affirm the Commissioner's decision denying Plaintiff's claim for DIB and SSI under Titles II and XVI of the Act.

Signed December 4, 2006.

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

The United States District Clerk shall serve a true copy of these findings, conclusions and recommendation on the parties.  Pursuant to Title 28, United States Code, Section 636(b)(1), any party who desires to object to these findings, conclusions and recommendation must serve and file written objections within ten days after being served with a copy.  A party filing objections must specifically identify those findings, conclusions or recommendation to which objections are being made.  The District Court need not consider frivolous, conclusory or general objections.  A party's failure to file such written objections to these proposed findings, conclusions and recommendation shall bar that party from a *de novo* determination by the District Court.  *See Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466, 472 (1985).  Additionally, any failure to file written objections to the proposed findings, conclusions and recommendation within ten days after being served with a copy shall bar the aggrieved party from appealing the factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court, except upon grounds of plain error.  *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996) (en banc).